E. J. SPARKMAN, d/b/a E. J. SPARKMAN & CO. *v.*
MARGARET RENFRO ETTER ET AL

5-5236                                    458 S. W. 2d 129

Opinion delivered October 5, 1970

*Bethell, Stocks, Calloway & King,* for appellant.

*Warner, Warner, Ragon & Smith* and *Garner & Parker,* for appellees.

CONLEY BYRD, Justice. This litigation arises out of the rights and liabilities of appellant E. J. Sparkman d/b/a E. J. Sparkman & Co. as tenant and appellees Margaret Renfro Etter, Marion H. Helbing, Lawrence W. Lamm and Edward J. Lamm as landlords of the old S & Q building. The record shows that appellant moved to Fort Smith in 1944, and began operating the S & Q Clothing Store at 622 Garrison Ave. in partnership with Sam Sheldon and Sol Lasky. At that time the business was being operated in a building 25 by 140 ft. long,

owned by Rose Pappenheimer, now held by appellees Helbing and Lamm. At that time Merchants National Bank of Fort Smith was acting as trustee for appellee Margaret Renfro Etter. The Etter estate owned a building 25 by 90 ft. immediately west and adjoining the Pappenheimer building in which a shoe store was being operated at the time Sparkman went to Fort Smith. Sparkman and his partners on Sept. 15, 1945, entered into a lease agreement with Merchants National Bank and with Rose Pappenheimer whereby the common party wall between the two buildings could be removed in accordance with architectural plans and specifications approved by both lessors.

The Pappenheimer lease, insofar as is here pertinent and as it was extended until July 31, 1966, provided:

> "The tenant shall take good care of the premises and shall, at its own cost and expense, keep same in good condition, order and repair, both inside and outside, including all sidewalks, alleys, sewers and appurtenances and, at the end of the term, shall deliver up the demised premises in good order and condition.

> \* \* \*

> The Landlord agrees that the Tenant may, at its own expense, from time to time during the term hereof, make such alterations and changes, structural or otherwise, to the demised premises as it finds necessary or convenient for its purpose—provided, however, that no such alterations or changes shall be made without the prior written approval and consent of the Landlord. Any such alteration and changes which shall remain on the demised premises at the end of the term of this lease, or any extension thereof, shall be considered as improvements and become a part of the real estate. Tenant agrees that all alterations and changes made by it will be erected or made in a first-class, workmanlike manner.

Any trade fixtures, equipment and other property installed in or attached to the demised premises by and at the expense of the Tenant shall remain the property of the Tenant; and the Landlord agrees that the Tenant shall have the right at any time, and from time to time, to remove any and all of its trade fixtures, equipment and other property which it may have stored or installed in the demised premises, including but not limiting the same to counters, shelving, showcases, mirrors, and air-conditioning, cooling and other movable machinery. The Landlord agrees not to mortgage or pledge the Tenant's trade fixtures, equipment and other property.

The original lease with the Etter estate insofar as here pertinent provided as follows:

". . . The Lessees shall have possession of said premises for the month of January 1946 without paying rent therefor, in order to permit Lessees to make the improvements hereinafter specified, and to install its furniture, fixtures, and stock of merchandise in the premises.

The Lessees at their own expense are authorized to remodel the front of said building, and with the consent of the owner of the building located on the southwesterly half of said Lot 14, are authorized, at their own expense, to cut an opening or openings in the party wall between said two buildings, all of said work to be done in a good and workmanlike manner, and in such manner as not to endanger the structural safety of said buildings, and all of said work to be done at the risk and expense of the Lessees. At the end of the term of this lease the Lessees at their own expense and risk shall restore said opening or openings in said party wall in a good and workmanlike manner, and at their own expense and risk shall restore said front to its present condition as near as may be.

And it is agreed that said Lessees will well and truly pay said rent as aforesaid at the time and in the installments as stated; that said Lessees will keep the premises in good repair (except the roof, which will be kept in repair by Lessor) and at the end of the term hereof surrender the same in good order, condition and repair as the same are now, ordinary wear and tear, and loss or damage by fire, storm, or other unavoidable casualty covered by extended insurance excepted. . ."

This lease was subsequently extended for an additional five year period by a modification agreement dated May 25, 1950, with pertinent provisions as follows:

". . . [I]n consideration of Lessees' agreement to make valuable improvements to the demised premises in the manner and to the extent provided in paragraph numbered '2' hereof;

NOW, THEREFORE, it is by the parties hereto mutually agreed that said Lease Agreement dated 15 September 1945, shall be, and the same is hereby extended for an additional term of five years beginning February 1, 1956, upon the same terms and conditions as provided in said original Lease except as follows:

\* · \* \*

[2] And the Lessees agree and contract, beginning not later than July 1st, 1950, to _____, build and construct a basement under the demised premises at a cost of approximately $10,000.00; and said basement may be connected with any basement existing or excavated and constructed on adjoining premises provided, however, the Lessees agree and contract, on the expiration of the term as herein extended, to erect and construct a proper and adequate partition, party wall extending the entire length of such basement and separating completely the base-

ment constructed on the demised premises from any basement on adjoining premises, and Lessees shall procure the execution and acknowledgment by adjoining owners of a party wall agreement sufficient and necessary to this end. All construction work done shall be performed in a good and workmanlike manner and so as to protect and preserve the structural safety of the improvements on, or put on, the premises; and all of said work shall be done at the sole risk and expense of the Lessees."

On September 1, 1955, this lease was extended for an additional 10 years beginning February 1, 1956, the only change being $550 monthly rental instead of $300 as in the original lease. On January 14, 1966, and after difficulty arose between the parties, for a recited consideration of $2,200 cash paid, the lease was extended for an additional six months beginning February 1, 1966, at the same rental of $550 payable on the first day of each month beginning February 1, 1966.

Commencing around July 15 or 16, Sparkman moved his clothing store across the street into a building that he had built for that purpose. On August 1, appellee Etter inspected the premises and, being unhappy with the condition in which Sparkman had left the building, caused the premises to be inspected by city officials and locks thereon to be changed. As a result of city inspections, Mrs. Etter received letters advising her that the building had been inspected at her request, that the structure was in bad condition, including the electrical system, plumbing and heating, and that the structure would have to be renovated and brought up to date to meet all minimum city codes before it could be occupied again. On August 2, Mrs. Etter received from appellant Sparkman some architectural plans and specifications mailed on July 29, showing the work Sparkman proposed to do to comply with the terms of the lease as he understood it. The plans were also mailed to the Rose Pappenheimer heirs.

Appellee Etter originally brought this action at law against Sparkman demanding damages in the amount

$55,000.00. Appellees Marion H. Helbing, Lawrence W. Lamm and Edward J. Lamm, the Pappenheimer heirs, intervened asking for damages of $20,000.00. Subsequently upon motion of the intervenors the matter was moved to Chancery. After hearing testimony and inspecting the building a number of times the Chancellor rendered a 41 page formal written opinion incorporated in the court's order requiring specific performance in certain instances, allowing rent for holding over and damages totaling $3,300 to the Etters and $3,600 to the Pappenheimer heirs. In addition the trial court directed Sparkman to return a number of fixtures removed and in other instances to redecorate walls where fixtures had been removed. For reversal appellant contends that the trial court erred in allowing rent after the end of the term of leases, in ordering the tenant to perform work not required by the leases, in admission of evidence of matters not properly pleaded and in granting relief not requested.

The record shows, according to the architectural plans and specifications used by contractor Don Bailey in 1946, that both buildings were completely renovated with false ceilings, lighting fixtures and heating and air-condition being put in by the tenants. As far as can be ascertained from the record only four walls were involved in either lease when the leases were signed.

Appellee Etter was born Feb. 14, 1932, and was 37 at the time of trial. She had no recollection of the building's condition when the 1946 lease was signed. Mrs. Etter testified about debris she found cluttering the floor, bare walls left where fixtures had been removed and about removal of lighting fixtures and heating fixtures; all of which was shown by photographs taken on August 1, 1966, and introduced through her. She also testified that the building had been leased for an auction after Sparkman vacated the premises.

Mr. Don Bailey, the contractor who made the installations for appellant Sparkman in 1946, was called as a witness by appellees. He testified that he was a

licensed contractor from 1948 through 1968. He had had in his possession prior to trial the plans and specifications drawn up in 1946 by architect Chester Nelson and in addition had personally visited the buildings after the 1966 lease expired. Because of the passage of time Mr. Bailey could not recall the condition of the premises when he began his work in 1946. When he viewed the premises he made an estimate of the cost involved. With respect thereto the record shows the following:

"Q. Don, when you viewed the premises prior to October 10, 1966, what did you do? Did you go in, walk in the door, and walk through the premises?

A. I went over the whole building, yes.

Q. Did you take measurements?

A. Yes.

Q. Did you make a pretty close observation of the premises at that time?

A. Yes, sir.

Q. From your observation and notes, did you make an estimate of what you thought it would take to restore the premises to a reasonably good condition?

A. I was told to make an estimate to put the building back in rentable or lease repair; where it could be either rented or leased, for all damages that had been done to the building. And that is what I did.

Q. What was the amount of that estimate?

MR. CALLAWAY: . . . The witness has not made an estimate that has any relevance.

* * *

A. At this time I was making an estimate on both sides of the building. That estimate was $50,-000.00.

Q. Was that a definite amount, or an approximate amount?

A. That was an approximate amount. It was only an estimate."

At page 320 of the record the following occurred:

"THE COURT: Did you make an estimate, Mr. Bailey, to put these buildings back in the condition that they were in before?

A. No, I made an estimate to put these buildings in the condition that they could be leased or rented."

On further redirect and recross-examination Mr. Bailey testified as follows:

"BY MR. HARRIS:

Q. You testified, Don, that the improvements made by Mr. Sparkman all during the course of his lease increased the value. Had that increased value been maintained up until the time you saw it after he had vacated the premises?

A. Let's have that again.

Q. Was this value the same that he had increased it after he vacated the premises as it had been before? Did it have the same value?

A. I don't know about that.

Q. Had he kept the premises up and maintained them?

A. I would have to say no in certain areas.

FURTHER RECROSS EXAMINATION

BY MR. CALLAWAY:

Q. Would you specify the particular areas, please?

A. A couple of restrooms for one thing. Just go look at them.

Q. What else?

A. The floor on the Helbing side. Where he drug the fixtures across.

Q. What else?

A. I guess I will quit at that.

Q. So actually what you are talking about that you say were not maintained are the floors on the Helbing side, and the bathrooms that he built?

A. Yes.

Q. What is the cost of repairing the bathrooms, please sir?

THE COURT: He has covered that already.

Q. $250.00?

A. I didn't hear you.

Q. What is the cost of repairing the bathrooms, please?

A.  I think I have $250.00 in that.

MR. HARRIS:  Is that for half a side?

A.  Yes, sir.

Q.  Are the bathrooms on both sides that you refer to?

A.  That is for one side. I figured those one side at a time.

Q.  Is there a bathroom on each side of the building that you refer to?

A.  I thought there was.

Q.  Is there a bathroom downstairs and another one upstairs?

A.  I don't know.

Q.  Now, the tile that you say has come loose. Is that tile still there?

A.  Yes, it is scattered around there in spots.

Q.  Is it still there in the immediate area where it has come unstuck?

A.  Yes, sir.

Q.  And could be stuck back?

A.  No, sir.

Q.  Why not?

A.  It is torn up."

Other testimony by Mr. Bailey went to the cost of making repairs set out in his estimate which included

replacing the party wall, lighting fixtures, air-conditioning and heating, retiling floors and other redecoration such as painting and plastering. He also showed that some window panes had been broken out of the building and testified positively that had they been broken at the time he did his 1946 remodeling they would have been fixed.

Mr. Sparkman testified about the history of the negotiations leading up to the leases and the placement of the many fixtures into the building for his use and benefit. He admitted that the lighting fixtures, heating and air-conditioning and clothing racks had been removed from the old S & Q building and were being used in his new building. Mr. Sparkman reiterated his willingness, as set out in his pleadings, to restore the front of the building and the party wall and to revamp the electrical wiring so that each building would be wired independently.

POINT NO. I.  We agree with appellant that the trial court erred in allowing damages for holding over under the lease. It will be recalled that the Etter lease specifically provides: "At the end of the term of this lease, the lessees at their own expense and risk shall restore said opening or openings in said party wall in a good and workmanlike manner and at their own expense and risk shall restore said front to its present condition as near as may be." The authorities, see *Davidson* v. *Crump Manufacturing Co.,* 99 Mich. 501, 58 N. W. 475 (1894), hold that "at the end of the term" means after the expiration of the term of the lease. Thus by the provisions of the Etter lease, under which both appellees claim, appellant would have a reasonable time after July 31, 1966, during which he could enter the premises to make the necessary alterations in accordance with the lease terms. According to appellees' witness Mr. Bailey, this would be a period of three months. However, since the appellees took possession immediately—the next day—and have refused to approve the plans submitted, it follows that the appellant is entitled to three months from the date the mandate is filed in the trial court in which to perform his agreement.

Appellant's right to re-enter for purpose of replacing the party wall, however did not relieve him from otherwise returning the premises in good order and condition as set out in the leases.

With respect to damages, Mr. Bailey testified that the clean-up and drayage would be $200.00 for each side of the building, $250.00 to repair the rest rooms on each side and that the tile should be repaired on the first floor on the Pappenheimer side. According to Mr. Bailey this would amount to 4,000 sq. ft. at 45¢ per sq. ft. or a total of $1,800.00. It was his opinion that the tile could not be matched.

Thus, appellee Etter was entitled to receive $250.00 for plumbing and $200.00 for drayage for a total of $450.00 as damages for failure to return the premises in good order and repair. Appellees Helbing and Lamm are entitled to $250.00 damages for plumbing, $200.00 for drayage and $1,800.00 for the floor, making a total of $2,250.00 damages for failure to return the premises in good order and condition.

POINT II. All of the testimony shows that the light fixtures, carpeting, heating and air-conditioning and display cases were installed by tenant Sparkman for his own use and benefit and not to enrich the freehold. In *Romich* v. *Kempner Brothers Realty Co.,* 192 Ark. 454, 92 S. W. 2d 215 (1936), we pointed out that as between the landlord and his tenant, the tenant's claim to have articles considered as personal property is received with the greatest latitude and indulgence. In that case we held that a tenant was entitled to remove a sprinkler system. In *Arkansas Cold Storage & Ice Co.* v. *Fulbright,* 171 Ark. 552, 285 S. W. 12 (1926), we upheld removal of machinery and equipment used in making ice cream and soft drinks. In doing so we held:

"The chancery court decided that the property in controversy constituted removable trade fixtures, and our conclusion is that this decision was correct. It is very generally held by the courts and text-

writers that the rule as to removal of trade fixtures is more favorable where the relation of landlord and tenant exists than in regard to any other relationship of the parties (Ewell on Fixtures, p. 137), and this court has recognized that favorable aspect of the rule. *Stone* v. *Suckle,* 145 Ark. 387, 224 S. W. 735. The case of *Choate* v. *Kimball,* 56 Ark. 55, 19 S. W. 108, is a leading one in this court, and in that case we laid down, as the principal tests of removability, the intention of the party making the annexation and his situation and relation to the owner of the soil—whether the annexation was intended to be made as a permanent accession to the freehold or merely for the benefit of the party making it. It is apparent from the facts in this case that the property in controversy was placed in the building by the predecessors of appellees solely for their own use and benefit in the operation of the business in which they were then engaged, and that there was no intention to make the annexation for the purpose of improving the property. The annexation was therefore altogether for their own benefit and not for the benefit of the landlord. This is manifested by the fact that the building originally constructed by appellant and turned over to the tenants was of little value, and the additions thereto and annexations have been gradual, in accordance with the growth of the business, hence there was no material injury to the freehold by the removal of these fixtures.''

In *Bennett* v. *Taylor,* 185 Ark. 794, 49 S. W. 2d 608 (1932), we permitted the removal of a vault door installed by a bank, and in doing so we pointed out that, ''[T]he modern trend of decisions is in favor of the removal of articles affixed to the freehold by the tenant unless, from their very nature, it appears the fixtures were intended to be permanent, or that such was the intention of the parties.''

Consequently, it follows that appellant had a right to remove the fixtures from the Etter building under

the law and the Pappenheimer building by contract. His removal therefrom, which left a bare exposed wall in the same condition in which he found it at the time of his lease, does not constitute waste for which he can be held liable in damages under the terms of the leases here involved.

In view of our disposition of this litigation we need not discuss appellant's last point for reversal.

Upon remand the trial court should direct appellant to replace the party wall, the front of the building and the electrical wiring in accordance with the plans and specifications submitted and explained by his architect; to remove the S & Q sign from the terrazzo floor and from the front of the building; and to pay the damages set out under Point I above. Appellant is also obligated to replace any broken glass.

Reversed and remanded.