Timothy Tucker COLEMAN; Leslie Eagle Coleman; Candice
Coleman Heyward; Ren Tucker; Lauren Tucker; Jack R. Tucker Jr.;
Victor Halter; Vernon Tucker Jr.; Mary Ann Garner Frizone;
Cherron Garner Munson; Gayle Garner Roski; Tucker Garner;
Patricia Tucker Bell, and Marvin D. Thaxton, Trustee under
the Last Will and Testament of Cora A. Moore, Deceased  *v.*
REGIONS BANK; KARK-TV, Inc.; Combined Communications
Corp.; Gannett Company, Inc.

05-307                                                              216 S.W.3d 569

Supreme Court of Arkansas
Opinion delivered November 3, 2005

*Richard H. Mays Environmental Legal Services*, by: *Richard H. Mays*, for appellants.

*Chisenhall, Nestrud & Julian, P.A.*, by: *Charles R. Nestrud*, for appellee.

DONALD L. CORBIN, Justice. This case presents issues of construction of commercial leases and comes to this court after review by the Arkansas Court of Appeals. In this case, there are two sets of Appellants. The first set, known as "Tucker," are the heirs of Mildred Tucker Porter and Irma Tucker Engle, and are the distributees of the Tucker Company.[1] The second Appellant, known as "Moore," is Marvin D. Thaxton, who is the trustee under the last will and testament of Cora A. Moore, deceased. Appellees are Regions Bank, successor to the original lessee; KARK-TV, Inc.; Combined Communications Corp.; and Gannett Company, Inc. (collectively known as "the Bank"). The Pulaski County Circuit Court granted the Bank's motion for partial summary judgment and also ruled that the properties in this case are subject to an implied easement. Tucker and Moore appealed to the Arkansas Court of Appeals, which affirmed on the grounds that three points of appeal were procedurally barred, and that the trial court did not err in finding that the "good condition" clause of the leases did not require the Bank to return separate buildings. *See Coleman v. Regions Bank,* CA04-401, (Ark. App. March 2, 2005). Tucker and Moore filed a petition for review of that decision, pursuant to Ark. Sup. Ct. R. 2-4(c)(iii), alleging that the issue of whether the "good condition" clause in a ground lease of property applies to the configuration of the building when returned to the lessor is an issue of first impression in this state. We granted the petition. When we grant review following a decision by the court of appeals, we review the case as though it had

---

[1] The Tucker Appellants are: Timothy Tucker Coleman, Leslie Eagle Coleman, Candice Coleman Heyward, Ren Tucker, Lauren Tucker, Jack R. Tucker Jr., Victor Halter, Vernon Tucker Jr., Mary Ann Garner Frizone, Cherron Garner Munson, Gayle Garner Roski, Tucker Garner, and Patricia Tucker Bell.

been originally filed with this court. *See Cox v. Miller,* 363 Ark. 54, 210 S.W.3d 842 (2005); *Robinson v. Ford-Robinson,* 362 Ark. 232, 208 S.W.3d 140 (2005). We find no error and affirm.

The pertinent facts and procedural history of this case were throughly laid out by the court of appeals:

> In August 1952, [the Bank] executed two leases — one with the Tucker predecessors and the other with Moore — for the lease of the two parcels. Each lease permitted the Bank to construct its banking facilities on the parcels. Further, each lease allowed the Bank to make such alterations in and to the building as the Bank deemed necessary, provided that such alterations were not injurious to the leased premises. Finally, each lease required the Bank, upon termination, to deliver the building, except for bank fixtures, equipment, and bank vaults, in good condition, reasonable wear and tear excepted. Each lease, as extended, expired on July 31, 2002.
>
> In 1953-54, in accordance with the leases, the Bank constructed its then-new banking headquarters consisting of a two-story structure on the Moore property that housed the Bank's lobby and offices and a two-story structure on the Tucker property that housed a drive-through banking facility on part of the ground floor and additional office space on the second floor. The Bank's architects prepared the design for the building, and Tucker and Moore approved the plans. . . . As a result of the 1953-54 construction, the structures were integrated, having common electrical, HVAC, and plumbing systems and sharing common elevators, restrooms, and stairwells.
>
> In 1966-67, the Bank desired to expand its banking headquarters and acquired additional leasehold interests to the west of the Tucker and Moore properties. . . . In 1967, the Bank expanded its banking facilities to cover all of the Tucker and Moore parcels (the East Building). The drive-in banking facility was relocated to the ground floor under the western . . . side. There is no evidence regarding whether the Bank sought approval of its plans.
>
> The Bank also constructed a three-story structure on the [western side] (the West Annex) and connected it to the East Building through a two-story structure (the Overpass) that traversed the alleyway between the East Building and the West Annex. As a result of the 1967 construction, the separation of the structural

frame along the property line was maintained . . . and the banking facility continued to have integrated building services, having common electrical, HVAC, and plumbing systems and sharing common elevators, restrooms, and stairwells. This project is referred to as the 1967 expansion/modifications. . . .

Appellee KARK's involvement began in 1975, when the Bank moved into its current headquarters . . . and entered into a transaction with KARK whereby the Bank conveyed ownership of the banking facilities to KARK (subject to the interests of the landowners) and subleased the Tucker, Moore and [West Annex] ground leases to KARK, who remained on the premises until the sublease expired on June 30, 2002. The Tucker and Moore ground leases expired on July 31, 2002, and on that date Tucker and Moore became owners of the East building. Prior to the expiration of the leases, Moore and Tucker made demands on the Bank to remove the Overpass and to restore the buildings to good condition, including removing any environmental contamination.

The Bank filed a petition for declaratory judgment against Tucker, Moore, and KARK, seeking a declaration that it had complied with the terms of the leases and that the Bank, Tucker, and Moore be determined to have mutual use of the equipment, utilities, and services located in all of the buildings. . . . Moore and Tucker answered and counterclaimed, asserting the right to separate, independent buildings and denying the Bank's easement claims.[2] The counterclaim alleged, *inter alia*, that the Bank and its subtenant, KARK, breached the "good condition" and the "injurious to the leased premises" clauses of the leases, were negligent, and committed waste by constructing a building that effectively merged the Moore and Tucker properties and then failing to restore separate buildings at the expiration of the leases. The Bank's third amended petition sought judgment over against KARK on the independence claims. The trial court bifurcated the claims concerning the separation of the buildings from the claims that the Bank failed to return the buildings in "good condition" or pay for certain necessary repairs. Both sets of claims involve the "good condition" clauses.

Tucker and Moore moved for partial summary judgment on their claims for separate, independent buildings. The Bank re-

---

[2] These claims are referred to as the independence claims.

sponded by filing a motion for summary judgment, alleging that any breach of contract or "waste" claims that Moore and Tucker may assert for separate, independent buildings are barred by the statute of limitations. KARK filed a motion for summary judgment, asserting that it did not agree to assume any of the Bank's obligations on the independence claims and is not otherwise liable to the Bank on those claims. [Footnote omitted.]

In its first order, the circuit court denied Tucker and Moore's motion for partial summary judgment on liability of the Bank to return separate buildings or to place existing buildings in good condition. Additionally, the court granted the Bank's motion for partial summary judgment on the ground that the statute of limitations barred Tucker and Moore's action. The court also dismissed with prejudice Tucker and Moore's counterclaim against the Bank and dismissed with prejudice the Bank's claims against KARK dealing with the independence claims. Lastly, the court found that the Bank's initial petition for imposition of an implied easement was still pending and encouraged the parties to resolve the issues amongst themselves, while still allowing for the parties to return to court should they be unable to do so. The parties were unable to reach a conclusion on the easement issue themselves, and, in a supplemental order, the court found that an implied easement exists that allows all three owners to continue use of the common building features. This order also contained a certification of appealability of the independence claims, pursuant to Ark. R. Civ. P. 54(b).

For reversal, Tucker and Moore argue that the trial court erred in finding that (1) the ground leases did not require separate buildings; (2) the "alterations" clause of the ground leases was not violated by the 1967 expansion and modification; (3) the "good condition" clause was not breached at the termination of the lease due to the configuration of the buildings; and (4) an implied easement exists allowing all landowners to continue to use the common building features in the same manner as before.

## I. Separate Buildings

Tucker and Moore argue that the trial court erred in finding that the ground leases between them and the Bank did not require the Bank to provide separate buildings to Tucker and Moore at the termination of the leases. In making this determination, the trial court relied on two, distinct reasonings. First, that the ground

leases do not provide a basis of liability because the court did not agree that the lease terms should be interpreted to require construction of separate buildings at the end of the lease. Second, the trial court found that their claim was barred by the statute of limitations.

On appeal, Tucker and Moore initially only address one of the two grounds given by the circuit court in reaching its decision. It is not until their reply brief that they address the statute-of-limitations ground. Because they do not challenge the trial court's alternate ruling on the statute of limitations until their reply brief, this argument cannot be reached. This court has held that where the trial court based its decision on two independent grounds and appellant challenges only one on appeal, the appellate court will affirm without addressing either. *See Pugh v. State*, 351 Ark. 5, 89 S.W.3d 909 (2002); *Pearrow v. Feagin*, 300 Ark. 274, 778 S.W.2d 941 (1989). Furthermore, it is well settled that this court will not address arguments raised for the first time in the appellants' reply brief, because the appellee is not given a chance to rebut the argument. *Owens v. State*, 354 Ark. 644, 128 S.W.3d 445 (2003); *Maddox v. City of Fort Smith*, 346 Ark. 209, 56 S.W.3d 375 (2001). Consequently, Tucker and Moore's first argument cannot be examined because they did not challenge *both* independent grounds that the court relied on in making its decision until their reply brief. We thus summarily affirm on this point.

### II. "Alterations" Clause

Tucker and Moore next argue that the trial court erred in finding that the "alterations" clause was not violated by the Bank's 1967 expansion and modification. As with the previous point, the trial court denied relief to Tucker and Moore on alternative grounds, rejecting the claim on its merits and also finding that the claim was barred by the statute of limitations.

On appeal, Tucker and Moore initially addressed only the first of the two grounds given by the trial court in reaching its decision. It is not until their reply brief that they address the finding under the statute of limitations. Accordingly, as set out above, we cannot reach the merits of this point of appeal and we thus summarily affirm the trial court's ruling.

### III. "Good Condition" Clause

For their third point on appeal, Tucker and Moore argue that the trial court erred in finding that the "good condition"

clauses were not breached by the Bank's failure to return separate, individual buildings at the expiration of the leases. They argue that the Bank failed to comply with the "good condition" requirement of the leases, not only because of the alleged shabby condition of the buildings' interiors, but also because of the interlinking configuration of the buildings and equipment and the inability of a single owner to exercise the normal incidents of ownership on or over its respective property. Specifically, they claim that "good condition" clauses commonly found in leases, such as the two present here, apply to alterations to the configuration of the building performed by the tenant during the lease. This argument is without merit.

The interpretation of the "good condition" clauses is a matter of contract construction presenting questions of law for the court to decide. *Smith v. Prudential Prop. & Cas. Ins. Co.*, 340 Ark. 335, 10 S.W.3d 846 (2000). The first rule of interpretation of a contract is to give to the language employed the meaning that the parties intended. *See First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 832 S.W.2d 816 (1992); *Valmac Indus., Inc. v. Chauffeurs, Teamsters & Helpers Local Union No. 878*, 261 Ark. 253, 547 S.W.2d 80 (1977). In construing any contract, we must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning. *Id.* The best construction is that which is made by viewing the subject of the contract, as the mass of mankind would view it, as it may be safely assumed that such was the aspect in which the parties themselves viewed it. *Missouri Pac. R.R. Co. v. Strohacker*, 202 Ark. 645, 152 S.W.2d 557 (1941). It is also a well-settled rule in construing a contract that the intention of the parties is to be gathered, not from particular words and phrases, but from the whole context of the agreement. *First Nat'l Bank of Crossett*, 310 Ark. 164, 832 S.W.2d 816.

In the present case, there is no ambiguity as to what the "good condition" clause of each lease said. Both leases are almost identical in their make-up and convey the same notion of a return of the premises in "good condition." The Tucker lease provided:

12. The Lessee agrees, during the term of this lease, at its own expense, to keep in *good order and repair* the inside and outside of the building or buildings on the leased premises and the sidewalks and passageways adjacent thereto. Upon the termination of this lease, the *building or buildings and improvements shall be delivered to the Lessors in good condition, reasonable wear and tear during the term of this lease*

*excepted*. The *buildings and permanent improvements erected and made upon the leased premises by the Lessee*, other than bank fixtures, equipment and bank vaults, *shall be and remain the property of the Lessors at the termination of this lease*; provided, however, upon said termination the Lessee shall have a reasonable time thereafter within which to remove its bank fixtures, equipment, vaults, heating units, air conditioning plants and other personal property from the premises, even though the same may be attached thereto. [Emphasis added.]

Similarly, the Moore lease provided:

9. The Lessee agrees, during the term of this lease, at its own expense, to keep in *good order and repair* the inside and outside of the building on the leased premises and the sidewalks and passageways adjacent thereto. Upon the termination of this lease the *building shall be delivered to the Lessor in good condition, reasonable wear and tear during the term of this lease excepted. The building and permanent improvements built upon the leased premises by the Lessee, other than bank fixtures, equipment and bank vaults, shall become the property of the Lessor and shall remain the property of said Lessor at the termination of this lease*; provided, however, upon the termination of this lease the Lessee shall have a reasonable time thereafter within which to remove its personal property, bank fixtures, equipment, bank vaults, et cetera, from the premises, the rent to continue during such time. [Emphasis added.]

There is no ambiguity as to the plain meaning of both these clauses: Tucker and Moore expected to have their property returned in good condition at the termination of the lease and anticipated to retain all permanent improvements to said property. Both leases also contained alterations clauses and building descriptions, which are relevant in the analysis and applicability of the "good condition" clauses to this unique situation.

While this case is initially one of contract construction, it is necessary to closely examine the "good condition" clauses in light of Tucker and Moore's attempt to force reconfiguration and the removal of permanent improvements on the buildings. While there is no Arkansas law that deals specifically with the issue of "good condition" clauses and the removal of permanent improvements, several other jurisdictions have broached the subject. Those cases provide insight into the proper interpretation of the "good condition" clauses here.

In *Raybestos-Manhattan, Inc. v. Friedman*, 156 Ga. App. 880, 881, 275 S.E.2d 817, 819 (1981), the court examined a "good condition" clause and explained that:

> The provision for returning the premises in as good condition as received, ordinary wear and tear excepted, was a rule of common law and is usually understood to mean no more or less when inserted in contemporary contracts. It includes that usual deterioration which results from the day to day use of the premises and from lapse of time.

This conclusion is in line with an earlier New York Supreme Court decision finding that "a covenant by a lessee to make 'all inside and outside repairs' imports only a general covenant to make ordinary, and not extraordinary, repairs." *Street v. Central Brewing Co.*, 101 A.D. 3, 5, 91 N.Y.S. 547, 549 (1905) (quoting *May v. Gillis*, 169 N.Y. 330, 333, 62 N.E. 385, 386 (1901)). Thus, it is clear from these courts' holdings that the "good condition" clause is to be construed not to require extraordinary steps by the lessee to maintain good condition, but rather those steps reasonably taken to maintain the premises in good condition.

Nevertheless, this explanation of the "good condition" clause is only a stepping stone in our analysis of whether the "good condition" clauses here were breached by the Bank's refusal to change the improvements it had made and to reconfigure the buildings. In the present instance, we have a situation whereby the lessors are claiming that the respective leases called for the Bank to separate the buildings and put them in a good, leaseable condition.

It is black letter law that "[t]he lessee is not required to remove improvements made by him with the consent of the landlord or under authority of the lease unless the lease so provides[.]" 52A C.J.S. *Landlord & Tenant* § 884 (2005) (footnote omitted). This principle is supported by multiple jurisdictions who have relied on this reasoning in regards to their analysis of removal under "good condition" clauses. *See Lamonica v. Bosenberg*, 73 N.M. 452, 389 P.2d 216 (1964) (holding that when alterations were made with the landlord's knowledge and implied consent, the tenant has no implied obligation to restore the leased premises at the end of the term to its prior condition); *Savage v. University State Bank of Champaign*, 263 Ill. App. 457 (1931) (holding that the lessee is not required to remove a bank vault that was installed with the consent of the landlord or under the authority of the lease, in

the absence of an express requirement to do so); *Arkansas Fuel Oil Co. v. Connellee*, 39 S.W.2d 99 (Tex. App. 1931) (explaining that a lessee is not required to remove improvements made by him with the consent of the landlord, even if he had the right and option to do so in the contract). *See also Cawley v. Jean*, 218 Mass. 263, 105 N.E. 1007 (1914); *Perry v. J.L. Mott Iron Works Co.*, 207 Mass. 501, 93 N.E. 798 (1911); *Marks v. Chapman*, 135 Iowa 320, 112 N.W. 817 (1907). Consequently, removal of permanent improvements is not required if the lessor acquiesced or approved the improvements or alterations. This conclusion is further supported by other jurisdictions.

In *Leslie Pontiac, Inc. v. Novak*, 202 N.W.2d 114, 115 (1972), the Iowa Supreme Court was faced with the task of interpreting a clause that required the tenant, at lease expiration, to " 'quit and surrender the demised premises without notice in a good and substantial state of repair, reasonable wear and tear . . . excepted.' " Furthermore, the "Landlord expressly waived 'any right to claim any signs, equipment, and/or fixtures affixed to the realty as real property' and recognized tenant's right to remove them at the lease's end provided that the premises were 'repaired and restored' to their original condition." *Id.* There, as in this case, the tenant made alterations and improvements to existing buildings with the landlord's consent. The tenant did not pursue his option to remove the alterations and fixtures. The court found that because the lease gave the lessee the right to make alterations and improvements and there was only an option to remove at the lease expiration, there was no requirement that the buildings be restored to their original condition unless he exercised his removal option. Specifically, the court held:

> Where alterations were made and removed, tenant's only obliga-
> tion was to surrender the premises in a good and substantial state of
> repair, subject to the exceptions stated in the lease. Where, as here,
> a lease carries with it the right to adapt the premises to their
> intended use, the lessee is under *no obligation to restore them* to original
> condition at lease expiration unless the alterations are removed.

*Id.* at 116 (emphasis added).

Similarly, in *Ten-Six Olive, Inc. v. Curby*, 208 F.2d 117 (1953), the Eighth Circuit was faced with the issue of whether a lessee should be required to remove partition walls it erected on the leased premises. There, the lease contained both an alterations

clause and a "good condition" clause similar to those in the Tucker and Moore leases. The court found that the evidence demonstrated that the lessor maintained offices adjacent to the leased property, watched the changes being made to the property, and never objected to these changes. Based upon this finding, the court reasoned that the failure to object constituted a waiver of the consent provision in regards to alterations. Furthermore, the court held that "the 'good condition' clause provided that the premises should be surrendered in as good condition as received, ordinary wear and tear excepted. It did not provide they should be returned in the same condition, or like condition." *Id.* at 122. Consequently, the court held that the walls did not have to be removed at the termination of the lease because they had become permanent improvements on the premises.

The most pertinent analysis to the present situation can be found in *McKenzie v. The Western Greenbrier Bank*, 146 W. Va. 971, 124 S.E.2d 234 (1962). There, the West Virginia Supreme Court examined the question of whether a vault was a permanent fixture and thus part of the realty, or whether removal was required in order to comply with the "good condition" clause of the lease. Specifically, the court phrased the issue as whether the lessor has "the right to *require* the lessee to remove the fixture." *Id.* at 976, 124 S.E.2d at 237. The lease provided the lessee the right to make alterations, additions, and improvements, required the lessee to return the premises in good condition at the end of the lease, and gave the lessee the option to remove the vault equipment at the end of the lease. The court found that the lessor could not force the removal of the vault because the conditions and provisions of the lease did not allow for any other conclusion. In reaching this determination, the court explained that a lessee is not required to remove improvements made within his authority under the lease or made with the consent of the lessor:

> All of the conditions and provisions in the lease, both as to the removal of permanent fixtures or improvements and the repairs to the building must be read together, and should if possible be interpreted together, in order to give meaning to each and reasonable meaning to all of the language used.

*Id.* at 977, 124 S.E.2d at 238. The court then held that:

> [A] covenant to keep the demised premises in good repair, and surrender the same in as good condition as reasonable use thereof

> will permit, does not obligate the tenant to restore the premises to the condition in which they were at the time of the lease, where the necessity of restoration is due to alterations which the tenant made under the authority of the lease.

*Id.* at 981, 124 S.E.2d at 239.

The weight of authority in this country regarding "good condition" clauses and the removal of permanent improvements is such that a lessee is not required to remove improvements made with the consent of the lessor or under the authority of the contract. The lessee is merely required to make ordinary repairs in order to return the premises in "good condition."

In applying this analysis to the present case, it is clear that the Bank did not breach the "good condition" clause of the Tucker and Moore leases. First and foremost, all alterations and improvements made to the properties were done with the consent of Tucker and Moore. In addition to actual, physical approval, the improvements were made pursuant to the individual leases. The Moore lease provided:

> 8. Lessee shall further have the right, at its own expense, from time to time, to make such alterations and modifications in and to the building to be erected by it on the leased premises, as may be deemed necessary and advisable by Lessee; provided, however, that such alterations or modifications shall not be of such type and nature as to be injurious to the leased premises.

This "alterations" clause allowed the Bank to make alterations and improvements to the building that it deemed necessary. Additionally, the Tucker lease contained a similar "alterations" clause:

> 8. Lessee shall have the right, at its own expense, from time to time, to make such alterations and modifications in and to the building or buildings on the leased premises as may be deemed necessary and advisable by Lessee; provided, however, that such alterations or modifications shall not be of such type and nature as to be injurious to the leased premises.

These provisions thus allowed the Bank to proceed and improve upon the buildings upon the leased premises.

Second, Tucker and Moore's argument that the lease contemplated separate buildings is without merit because they ap-

proved, either directly or implicitly by their actions, all plans and renovations to the buildings. As stated above, when improvements are made with the landlord's consent the tenant is under no duty to remove or reconfigure the buildings to their prior state.

Third, there is no doubt that the only provision that allowed or discussed removal at the end of the lease term referred to bank fixtures, vaults, and bank equipment.[3] This is not the same as the permanent improvements. Moreover, the leases specifically referred to permanent improvements as becoming property of the lessor at the termination of the lease. Consequently, the Bank was under no duty to return separate buildings to Tucker and Moore.

Finally, Tucker and Moore maintain that this court's decision in *Sparkman v. Etter*, 249 Ark. 93, 458 S.W.2d 129 (1970), is applicable to the present situation. Specifically, they assert that *Sparkman* recognizes that connected buildings returned to separate owners at the end of the lease are not in good condition as contemplated by the "good condition" clause of leases. This is a misinterpretation of this court's holding in that case. While there are some similarities between the facts of *Sparkman* and the present case, those similarities end at a very vital point. Sparkman had entered into two, separate lease agreements with Merchants National Bank and Rose Pappenheimer. As part of the leases, he was allowed to remove a common party wall between the two buildings as long as it was in accordance with architectural plans and specifications approved by both lessors. Furthermore, the Pappenheimer lease contained a "good condition" clause and an "alterations" clause that allowed for changes to the premises with the written approval and consent of the landlord. The lease further stated that "[a]ny such alteration and changes which shall remain on the demised premises at the end of the term of this lease, or any extension thereof, shall be considered as improvements and become part of the real estate." *Id.* at 94, 458 S.W.2d at 130. The other lease explicitly allowed the lessee to remodel, make improvements to the building, and cut an opening in the party wall between the two buildings. The lease contained another significant requirement: "At the end of the term of this lease, the Lessees at their own expense and risk shall restore said opening or openings in said party wall in a good and workmanlike manner[.]" *Id.* at 95,

---

[3] The Tucker lease also gave the lessee the option of removing additional equipment or fixtures.

458 S.W.2d at 130. It is this specific requirement that this court relied on in finding that Sparkman was required to return within a reasonable time to fulfill the requirements of the lease and replace the party wall. No similar requirement is contained in the leases at hand.

■ In the present case, there simply was no agreement or provision within either lease for the Bank to restore any portion of the building or remove any improvements. Rather, both "good condition" clauses specifically pointed out that permanent improvements to the premises would become part of the building and revert back to the ownership of the lessor at the end of the lease. Consequently, *Sparkman* is inapplicable to the present case because of the specific requirements set forth in those leases. Furthermore, the conclusion in *Sparkman* is in line with the reasoning that improvements made with the lessor's consent do not have to be removed, absent explicit provisions within the lease. We thus affirm the trial court's finding that the "good condition" clauses in this case were not breached.

### IV. Implied Easement

For their final point on appeal, Tucker and Moore argue that the trial court erred in finding that the parties have an irrevocable license, an easement by estoppel, and a prescriptive easement upon the properties of each other. In reaching its determination that an easement existed, the trial court found that an *implied* easement exists to allow all three owners to continue to use the common building features in the same manner in which such common features were used when the building was owned by a single entity prior to the expiration of the ground leases. Consequently, the trial court's decision to grant this right of way was based upon the theory of an implied easement.

■ Nevertheless, Tucker and Moore focus on the grant of an easement to the Bank under three separate theories — irrevocable license, easement by estoppel, and prescriptive easement — none of which were addressed by the trial court. Furthermore, they did not address the theory of implied easements until their reply brief. As stated previously, it is well settled that this court will not address arguments raised for the first time in the appellants' reply brief, because the appellee is not given a chance to rebut the

argument. *See Owens*, 354 Ark. 644, 128 S.W.3d 445; *Maddox*, 346 Ark. 209, 56 S.W.3d 375. Consequently, we summarily affirm the trial court's ruling on this point.

Circuit court affirmed; court of appeals affirmed.

GLAZE, J., not participating.