## MAGIC TOUCH CORPORATION *v.* Alice HICKS

CA 06-944                                         260 S.W.3d 322

Court of Appeals of Arkansas
Opinion delivered June 27, 2007

*Mark Rees*, for appellant.

*Mixon Parker & Hurst, PLC*, by: *Donn Mixon*, for appellee.

SARAH HEFFLEY, Judge. Appellant Magic Touch Corporation brings this appeal from a $5,000 judgment awarded to appellee Alice Hicks on her complaint for wrongful discharge. Appellant argues on appeal that the trial court erred in concluding that there was no just cause for terminating appellee's employment. We agree that the trial court erred by not finding that appellee committed acts of insubordination, and we reverse and dismiss.

Appellant corporation owns apartment complexes and operates coin laundry and dry cleaning businesses in the Jonesboro area. Robert Rees is the president of the corporation. Appellee was hired by appellant effective May 13, 2004, at a salary of ten dollars an hour. Rees and appellee entered into an employment agreement that set out the terms of hire, which included a "guarantee" that appellee would work for appellant for at least thirty-six months. The contract further provided:

> It is agreed that Employee will not be fired without just cause as set out in the Employee Handbook. If Employee should be discharged, without such cause, she shall be paid a $5,000.00 fee for such wrongful discharge. If Employee should fail to work for Employer for this 36 month period, she shall pay to the Employee [sic] a $5,000.00 fee for breaking this agreement.

Appellee worked in the main office as a secretary. In that capacity, it was her primary responsibility to manage the apartments. She was to handle telephone inquiries concerning apartment openings, and she filled out applications and leases. Appellee was also required to assign cleaning crews and to make sure that the apartments were ready for occupancy.

Rees fired appellee on July 14, 2004, after two months of employment. Appellee then filed this suit for wrongful discharge, claiming that she had been fired without just cause as set out in the employee handbook. Appellant responded that it had good cause for terminating appellee's employment, citing multiple infractions of the employee handbook. After a hearing, the trial court found that the employee handbook was ambiguous in certain respects. The court then construed the provisions most strongly against the appellant as the drafter of the agreement and concluded that appellee was fired without just cause. In accordance with the agreement, the trial court awarded appellee $5,000. This appeal followed.

In Arkansas, an employer may fire an employee for good cause, bad cause, or no reason at all under the employment-at-will doctrine. *Cisco v. King*, 90 Ark. App. 307, 205 S.W.3d 808 (2005). While a contract for an indefinite term is terminable at will, a contract for a definite term may not be terminated before the end of the term, except for cause or by mutual agreement, unless the right to do so is reserved in the contract. *See Griffin v. Erickson*, 277 Ark. 433, 642 S.W.2d 308 (1982). There are two other exceptions

to the at-will doctrine: (1) where an employee relies upon a personnel manual that contains an express agreement against termination except for cause; and (2) where the employment agreement contains a provision that the employee will not be discharged except for cause, even if the agreement has an unspecified term. *Ball v. Arkansas Dep't of Community Punishment*, 340 Ark. 424, 10 S.W.3d 873 (2000).

In the case at bar, the employment contract was for a definite term and specifically provided that appellee would not be discharged except for good cause as set out in the employee handbook. The parties are thus in agreement that the contract was not terminable at will. For reversal, appellant argues that it had good and just cause for firing appellee because she violated a number of rules found in the handbook, including excessive absenteeism, requests for unauthorized vacation leave and holiday pay, the violation of a standards-of-conduct provision, the violation of a confidentiality-of-pay provision, the violation of the availability-for-work provision, and insubordination.

The standard of review of a circuit court's findings of fact after a bench trial is whether those findings are clearly erroneous. *First Nat'l Bank v. Garner*, 86 Ark. App. 213, 167 S.W.3d 664 (2004). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

At the hearing, it was disclosed that appellee's personnel file documented ten excused absences in her two months of employment. The employee handbook contained a provision that stated "[i]f you are absent 4 times, either excused or unexcused, in a 3 month period you will be terminated." By contrast, the absence reports filled out by appellee and a manager contain the statement "over three unexcused absences can result in your termination."

The handbook also directed employees not to discuss their salaries with one another and stated that "[i]f we find that someone else knows what you make we will either terminate you or reduce your pay." Appellee admitted she had violated this provision by discussing her earnings with another employee. That employee, however, was the payroll clerk, who by virtue of her position, already had knowledge of appellee's salary.

The record also discloses that appellee requested a week of vacation during the month of July, and appellee testified as to her belief that she should have been paid for the Memorial Day and

Fourth of July holidays. Mr. Rees advised appellee that she was not yet eligible for vacation leave or paid holidays. He also testified that he overheard appellee telling another employee that she was going to take a week of vacation whether Rees approved it or not. On these subjects, the handbook provided that an employee would receive five working days of vacation at half pay after working for the company for fifteen months. Requests for vacation leave were required to be made forty-five days in advance. Full-time employees were also eligible for paid holidays, such as Memorial Day and the Fourth of July, if the employee had worked for the company for six months and had not been late or absent during the thirty days preceding the holiday.

The employee handbook contained another provision stating that "[e]mployees must be available for work during normal business hours." It further stated that "[a]t times you may be needed to fill in for another employee that is not at work during their work schedule. You will be expected to be available to do this when needed. This is something that you may not want to do today but tomorrow when you need someone to work for you, you will be glad you did."

In her testimony, appellee maintained the position that her work schedule was confined to week days from 8:00 a.m. to 5:00 p.m. She acknowledged that she had been called upon outside of that time frame. Appellee testified that she received numerous phone calls at home on the weekends. She had once delivered coins to one of appellant's laundromats. She also showed an apartment to a friend's son one weekday after work. On another occasion, she was required to visit an apartment to see if it was ready for a couple who was moving from Memphis. Appellee's testimony reflects that she was compensated for delivering the coins and for the work associated with the apartments.

On the morning of Saturday, July 9, 2004, Mr. Rees telephoned appellee and asked her to go to the office to get a key out of the safe and lay it on a desk for another employee to retrieve. Rees said that he was out of town with his family and that the key was needed for a man who had just decided to lease an apartment. Appellee initially agreed to take care of this matter, a task which she estimated would have taken five minutes. When she finished speaking with Rees, appellee called another employee, Linda Brady. Appellee then called Mr. Rees back. As a result of their conversation, appellee did not honor Rees' request to get the key.

The employee handbook also provided that insubordinate behavior was grounds for immediate dismissal. The handbook further identified "being unpleasant to your Co-Employees and disrupting work" as a violation of policy that could cause termination.

In regards to the second phone conversation between appellee and Rees on July 9, appellee testified that she called Rees back and told him that she was "mad as hell" at him for asking her to get the key. She said that she could not understand how Rees had leased an apartment when he was not in town or why another employee could not have gotten the key. Appellee testified that she was respectful when speaking to Rees and that she was laughing toward the end of the conversation. Rees testified, however, that he discerned no laughter in appellee's tone and that he "nearly fell out of his chair" when appellee stated that she was mad as hell. He decided to make other arrangements for getting the key.

Linda Brady was the employee appellee called between conversations with Rees. Brady stated that appellee was complaining about Rees's request and that she was very angry and speaking in a loud tone of voice. Brady felt that appellee was trying to persuade her to go get the key.

Mr. Rees also spoke of an incident that happened the following Thursday. On this day, Rees had a discussion with appellee and other secretaries about a form that was supposed to be placed in files. He said that appellee "unloaded on me" and then accused the other women of conspiring against her and trying to make her look bad. Linda Brady was present and said that appellee was quite belligerent and that the argument between Rees and appellee lasted around thirty minutes. Appellee said that she did not recall this incident and that she did not become irate with Mr. Rees.

In his oral ruling from the bench, the trial judge found that the terms of the employee handbook were largely ambiguous. Although the trial judge observed that he would have fired appellee because of her behavior on July 9, he determined that insubordination did not satisfy the requirement of just cause for terminating appellee's employment because that term was not defined in the handbook. Appellant contends that the trial court's ruling was clearly erroneous. We agree.

It is the duty of courts to enforce contracts as written and in accordance with the ordinary meaning of the language used and

the overall intent and purpose of the parties. *Dugal Logging, Inc. v. Arkansas Pulpwood Corp.*, 66 Ark. App. 22, 988 S.W.2d 25 (1999). Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one equally reasonable interpretation. *Ison v. Southern Farm Bureau Casualty Co.*, 93 Ark. App. 502, 221 S.W.3d 373 (2006). The fact that a term is not defined does not automatically render a contract ambiguous. *Zulpo v. Farm Bureau Mutual Insurance Co. of Arkansas*, 98 Ark. App. 320, 255 S.W.3d 494 (2007).

The determination of whether ambiguity exists is ordinarily a question of law for courts to resolve. *Murphy Oil USA, Inc. v. Unigard Security*, 347 Ark. 167, 61 S.W.3d 807 (2001). We do not defer to the trial court's determinations of law. *Pittman v. Pittman*, 84 Ark. App. 293, 139 S.W.3d 134 (2003).

We find no ambiguity in the word insubordination, even though that term was not defined. Its meaning is not uncertain, nor is it susceptible to more than one reasonable interpretation. In construing any contract, we must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning. *Coleman v. Regions Bank*, 364 Ark. 59, 216 S.W.3d 569 (2005). The best construction is that which is made by viewing the subject of the contract, as the mass of mankind would view it, as it may be safely assumed that such was the aspect in which the parties themselves viewed it. *Id.* The word "insubordinate" is defined as unwilling to submit to authority; disobedient or mutinous. *Webster's New International Dictionary* (3d ed. 1993). *Webster's* also states that "insubordinate" applies to disobedience of orders, infraction of rules, or a generally disaffected attitude toward authority. *Id.*

The employee handbook provides that insubordination is grounds for immediate dismissal. Considering the plain meaning of the word, we now must determine whether appellee's conduct was insubordinate. Whether justification exists for termination of the contract under the facts and circumstances of a particular case is usually a question of fact. *Joshua v. McBride*, 19 Ark. App. 31, 716 S.W.2d 215 (1986). In this, we are persuaded by the trial judge's comment that he would have fired appellee based on her behavior on July 9. In that episode, appellee angrily confronted Mr. Rees about a minor task he asked her to perform, which the testimony revealed was not out of the ordinary. Her attitude of hostility and disrespect was open and obvious, as she admittedly told Rees that she was "mad as hell" about his request. Appellee further under-

mined Rees' authority by complaining to another employee. Also, within a few days, appellee exhibited another outburst of belligerence and pugnacity when she "unloaded" on Rees and accused her fellow workers of conspiring against her. In addition to these two episodes, appellee was previously heard to state her intention to take a vacation whether Rees approved it or not.

■ In *Caldwell v. Blytheville School District No. Five*, 23 Ark. App. 159, 746 S.W.2d 381 (1988), we reviewed a school board's decision not to renew a teacher's contract for insubordination. We said that it was not irrational for a principal to expect teachers to comply with his directives and to act in a respectful, courteous, and professional manner. We also observed, "This is not to say that a teacher may not disagree with school policy; however, a teacher should not expect to be able to shout at his supervisors, call them liars, accuse them of conspiring against him, and walk out on conferences without action being justified by the board." In like fashion here, appellee's behavior need not have been tolerated by Rees. We are left with a definite and firm conviction that a mistake was made in this case, and we hold that appellant had just cause for firing appellee on the ground of insubordination. Because we are reversing on this basis, it is not necessary for us to examine the other reasons appellant offered to justify its decision to discharge appellee.

Reversed and dismissed.

PITTMAN, C.J., and ROBBINS, J., agree.